NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JUDITH INSELBERG VAN ETTEN,<br><br>*Plaintiff*,<br><br>v.<br><br>WELLS FARGO, N.A.,<br><br>*Defendant*. | Civil Action No. 18-11638<br><br>OPINION |

**ARLEO, UNITED STATES DISTRICT JUDGE**

**THIS MATTER** comes before the Court on Defendant Wells Fargo N.A.'s ("Defendant" or "Wells Fargo") Motion for Summary Judgment against Plaintiff Judith Inselberg Van Etten ("Plaintiff" or "Van Etten"), pursuant to Federal Rule of Civil Procedure 56. ECF No. 75. Plaintiff opposes the Motion. ECF No. 76. For the reasons set forth herein, Defendant's Motion is **GRANTED**.

I. BACKGROUND[1]

This action arises from a dispute over a loan modification (the "Loan Modification" or the "HAMP Loan Modification") under the Home Affordable Modification Program (the "HAMP"). Plaintiff alleges that the terms of the mortgage modification she entered into with Wells Fargo were predatory despite their compliance with all the HAMP guidelines. See Compl., ECF No. 1. Plaintiff claims that the loan terms violate (1) -1The New Jersey Consumer Fraud Act, N.J.S.A. §

---

[1] Unless otherwise indicated, the Court draws the following facts from Defendant's Statement of Uncontested Material Facts ("Def. SOUMF"), ECF No. 75.2, and Plaintiff's Responsive Statement of Contested Material Facts ("Pl. RSOCMF"), ECF No. 76.1.

56:8-1 et seq., ("NJCFA") and (2) the covenant of good faith and fair dealing.  Id.  For the reasons set forth below, the Court finds that Plaintiff's claims are preempted by federal law.

### A. The Original Loan

On November 29, 2005, Plaintiff, a realtor by trade, acquired a loan for $359,000 from Defendant, which was secured by a mortgage on real property located at 26 Ave at Port Imperial, Unit 211, Bldg. 4, Town of West New York, New Jersey 07093 (the "Property").  Def. SOUMF ¶¶ 1, 34.  The loan had a term of thirty years with an initial principal and interest payment of $2,123.62.  Id.  The initial, adjustable interest rate was 5.875 percent with a maximum rate of 11.875 percent.  Id.

Shortly after obtaining the loan, Plaintiff began missing payments.  Id. ¶ 3.  After defaulting on a payment on November 1, 2007, Plaintiff started a forbearance plan.  Id.  However, Plaintiff was removed from the program for failing to make the necessary payments.  Id. ¶ 4.  On August 6, 2008, Plaintiff signed a loan modification that capitalized $14,899.99 of arrears into her loan balance, increasing her loan balance to $364,191.25 and her monthly payments to $2,232.99.  Id. ¶¶ 5,6.  When Plaintiff again defaulted in her payments on February 1, 2009, Defendant allowed her to enter into another forbearance agreement.  Id. ¶ 7.  As a part of that forbearance plan, she promised to make her loan current by December 1, 2009.  Id. ¶ 7.  However, Plaintiff was again removed from this program due to more missed payments.  Id. ¶ 8.

At this point, Defendant sent Plaintiff multiple Notices of Intent to Foreclose and on May 14, 2009, initiated a foreclosure action against Plaintiff in the Superior Court of New Jersey, Chancery Division, Hudson County.  Id. ¶¶ 9,10.  Plaintiff failed to contest the foreclosure.  Id. ¶ 11.  On February 6, 2013, the court granted Defendant final judgment on its uncontested foreclosure and a foreclosure sale was scheduled for October 10, 2013.  Id. ¶¶ 17,18.  However,

before the foreclosure sale could take place, Plaintiff applied for and obtained approval for the Trial Period Plan ("TPP") of the HAMP Loan Modification. Id. ¶ 19.

### B. The Home Affordable Modification Program

In 2008, Congress enacted the Emergency Economic Stabilization Act (the "EESA") to combat the financial recession and housing crisis. 12 U.S.C. §§ 5201-5261. The most significant part of the EESA was the Troubled Asset Relief Program (the "TARP"). 12 U.S.C. §§ 5211–5241. The TARP granted the Secretary of Treasury (the "Secretary") access to 700 billion dollars to purchase toxic assets and equity from financial institutions and strengthen the financial sector. Id. Congress specifically asked the Secretary to create systems to minimize foreclosures. 12 U.S.C. §§ 5219–5220. In 2009, the Secretary revealed the Making Home Affordable Program, which included the HAMP as one of these systems. Department of the Treasury, Making Home Affordable Handbook, 69-163 (Version 4.3 Sep 16, 2013) (the "MHA Handbook").[2]

The goal of the HAMP is to offer loan modifications to defaulting homeowners who would otherwise face foreclosure. Participation is voluntary, but if an institution decides to enter the program, it is bound by the HAMP's guidelines. MHA Handbook at 14. Defaulting homeowners are encouraged to apply for a HAMP Loan Modification and then participating servicers must evaluate their eligibility in a three-step process. Id. at 70-77. First, the homeowner must meet threshold requirements. For example, the loan must be for the homeowner's primary residence and have originated on or before January 1, 2009. Id. at 70-71. In addition, for a one-unit home, the unpaid principal balance must be $729,750 or less and current monthly payments need to be more than 31 percent of the homeowner's gross monthly income. Id.

---

[2] The MHA Handbook is a reference guide published by the Secretary of the Treasury to outline requirements and guidelines for Making Home Affordable Programs including the HAMP. This version of the MHA Handbook, Version 4.3, was in effect at the time of the HAMP Loan Modification on December 5, 2013. It is available at https://www.hmpadmin.com/portal/programs/guidance.jsp.

Second, the participating institution must conduct a "standard modification waterfall." Id. at 108-112. This waterfall sets out a list of four modifications that must be applied to a loan chronologically until the monthly payments are reduced as close as possible to 31 percent of the homeowner's gross monthly income. Id. Third, the institution must conduct a Net Present Value ("NPV") analysis, a calculation that discerns if the modified loan would be more profitable to the loan holder. Id. at 118. If the NPV computation reveals that it would be less profitable to modify the loan, the servicer is not required to offer the loan modification. Id. at 118-119. However, if the modification is shown to be more profitable than the original loan, the servicer must offer a TPP agreement using the modifications from the NPV analysis. Id. The TPP is a trial period where the homeowner proves that they can make the payments on the modified loan for three months. Id. at 122-126. If the homeowner successfully pays each month during the TPP, then the loan modification is made permanent. Id. at 126.

Plaintiff herself requested a HAMP loan modification, and it is undisputed that Defendant then followed every one of the above steps in implementing her HAMP modification. Def. SOUMF ¶¶ 29-32; Pl. RSOCMF ¶¶ 29-32. Defendant first verified that she met certain threshold requirements. Loan Application, ECF No. 75.38. Second, Defendant calculated Plaintiff's gross monthly income to be $6,645. Def. SOUMF ¶ 20[3]. Defendant then applied the following waterfall steps until Plaintiff's monthly payments were 31 percent of the calculated gross monthly income. Id. at 23-26.

---

[3] In her response to Defendant's Statement of Undisputed Material Facts, Plaintiff states that she does not dispute that the TTP letter stated her gross income was $6,645. Def. SOUMF ¶ 20; Pl. RSOCMF ¶ 20. She also does not dispute that she submitted a borrower assistance form dated July 29, 2013 in which she indicated that her monthly income was $8,707. Def. SOUMF ¶ 21; Pl. RSOCMF ¶ 21. Rather than directly disputing those numbers, she asserts that her Request for Modification and Affidavit to modify her original mortgage – which she prepared in 2010, "listed her monthly income at $1408 per month." Pl. RSOCMF ¶¶ 51, 60. Viewed together, the Court finds that Defendant's calculation of her income at the time she applied for the HAMP Loan Modification is not disputed.

1.  The first step of the waterfall is for the servicer to capitalize arrears including accrued interest, past due payments, and interest advances. MHA Handbook at 109. In accordance with this rule, "[Defendant] first capitalized accrued interest, out-of-pocket escrow advances, and servicing advances to obtain a target mortgage payment ratio of 31 percent." Def. SOUMF ¶ 23.

2.  The second step of the waterfall is to reduce the interest rate by one eighth of a percent at a time until the monthly payment is reduced to 31 percent of the gross monthly income, or the interest rate reaches a floor of 2 percent. MHA Handbook at 109-110. Defendant reports that it reduced the rate to 2 percent, the lowest permissible, for the first five years with a plan to increase over time, but never to an amount higher than the original rate. Def. SOUMF ¶¶ 24, 28.

3.  The third step of the waterfall is to extend the term of the loan up to forty years. MHA Handbook at 110. Defendant extended the loan to forty years and reamortized the loan. Def. SOUMF ¶¶ 25, 28.

4.  The last step of the waterfall is to defer a portion of the principal to the end of the loan. MHA Handbook at 110. Defendant finally, "deferred, or 'set aside,' repayment of a portion of the outstanding balance until the loan was paid off and also waived interest on the deferred amount." Def. SOUMF ¶ 26.

Finally, after reviewing Plaintiff's NPV analysis, Defendant offered Plaintiff the HAMP Loan Modification provided she made all three payments during her TPP. Def. SOUMF ¶¶ 19, 29-32; Pl. RSOCMF ¶¶ 29-32.

Plaintiff successfully completed her TPP and, on December 16, 2013, she signed an agreement for a permanent HAMP Loan Modification. Def. SOUMF ¶¶ 22, 27. The Loan

Modification required Plaintiff to pay $1,773.25 per month, 31 percent of her calculated gross monthly income, for a term of 40 years. Id. ¶ 19. The new principal amount became $515,535.67 due to the capitalization of Plaintiff's arrears, but Defendant deferred $241,200 of the principal and waived interest on this deferred portion to help lower Plaintiff's monthly payments. Id. ¶ 28. The interest rate was set at 2 percent for the first five years, 3 percent for the sixth year, 4 percent for the seventh year, and 4.250 percent for the remainder of the loan. Id.

On August 26, 2015, more than eighteen months after signing the HAMP Loan Modification, Plaintiff, represented by counsel, sent a letter to Defendant stating that she "did not quite understand the deferral issue" and requested that Defendant forgive this deferred amount ($241,200). Id. ¶ 37. In a letter dated October 20, 2015, Defendant declined to forgive the deferred amount as that was not agreed upon in the Loan Modification agreement. Id. ¶ 38. The letter further stated that Plaintiff is required to pay the deferred amount in full. Id.

### C. Procedural History

On July 13, 2018, Plaintiff filed this action against Defendant. ECF No. 1. The Complaint asserts two causes of action: violation of the NJCFA (count one) and violation of the covenant of good faith and fair dealing (count two). Id. On February 28, 2022, Defendant filed this motion for summary judgment, which Plaintiff opposed. ECF Nos. 75-76.

### II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(c), the Court should grant summary judgment when there is no genuine issue as to any material fact "'that would permit a reasonable jury to find for the nonmoving party,'" Boyle v. Cty. of Allegheny Pa., 139 F.3d 386, 393 (3d Cir. 1998) (citation omitted), and "the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In deciding a motion for summary judgment, the Court does

not "weigh the evidence to determine the truth of the matter," but rather assesses "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-52 (1986).

The Court construes all facts and inferences in the light most favorable to the non-moving party, see Boyle, 139 F.3d at 393, and the moving party bears the initial burden of demonstrating that no genuine issue of material fact remains, see Celotex Corp., 477 U.S. at 322-23.  If the moving party meets its burden, the non-moving party must present evidence demonstrating a genuine issue of material fact for trial.  See Anderson, 477 U.S. at 248-49. A non-moving party's "[u]nsupported allegations, subjective beliefs, or argument" cannot alone overcome a properly supported summary judgment motion.  V.C. by Costello v. Target Corp., 454 F. Supp. 3d 415, 423 (D.N.J. 2020).  If the non-moving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" summary judgment is warranted because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 59 n.5 (3d Cir. 1992) (internal quotation marks and citation omitted).

### III. ANALYSIS

Defendant argues that both of Plaintiff's state law claims are preempted by the HAMP under conflict preemption.  Def. Br. 23-26.  The Court agrees.

The doctrine of preemption is rooted in the Supremacy Clause of the United States Constitution, which provides that the "Constitution, and the laws of the United States . . . shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2.  This clause enables Congress to displace

7

state law if it intends.  Deweese v. Nat'l R.R. Passenger Corp. (Amtrak), 590 F.3d 239, 245 (3d Cir. 2009) (citing Hi Tech Transp., LLC v. N.J. Dep't of Envtl. Prot., 382 F.3d 295, 302 (3d Cir.2004)).

As a threshold matter, in every preemption case, the analysis is governed by two principles. Farina v. Nokia Inc., 625 F.3d 97, 115 (3d Cir. 2010).  First, the purpose of Congress is "the 'ultimate touchstone,'" so the court must consider the entire federal statute to discern its objectives. Id. at 115 (quoting Medtronic, Inc., v. Lohr, 518 U.S. 470, 485 (1996)).  Second, preemption inquiries start with "the basic assumption that Congress did not intend to displace state law." Farina, 625 F.3d at 116 (quoting Maryland v. Louisiana, 451 U.S. 725, 746 (1981)).  There is also "a strong presumption against preemption in areas of the law that States have traditionally occupied."  Sikkelee v. Precision Airmotive Corp., 822 F.3d 680, 687 (3d Cir. 2016).  However, these presumptions can be "overcome where a Congressional purpose to preempt or the existence of a conflict is 'clear and manifest.'"  Farina, 625 F.3d at 117 (quoting Fellner v. Tri–Union Seafoods, L.L.C., 539 F.3d 237, 249 (3d Cir.2008)).

Conflict preemption preempts state law in two circumstances: (1) "where it is impossible for a private party to comply with both state and federal requirements," or (2) when it creates "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Farina, 625 F.3d at 122 (quoting Fellner, 539 F.3d at 251).

Federal agency regulations can also preempt state laws and are given special consideration due to the delicate balance they strike between statutory objectives.  Farina, 625 F.3d at 115, 123; see also, Fellner, 539 F.3d at 243.  The Third Circuit has recognized that when Congress tasks an agency with promulgating regulations, it means for the agency specifically to handle the task of balancing various statutory objectives and publishing rules accordingly.  Farina, 625 F.3d at 123.

If state laws are allowed to add additional rules on top of what a federal agency has already regulated, it would permit states to rebalance the agency's careful considerations. Id. This creates a conflict because it establishes an obstacle to Congress accomplishing its goals. Id. at 122. For this reason, state laws are preempted under conflict preemption by agency regulations that strike a "delicate balance of statutory objectives." Id. at 123 (quoting Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 348 (2001)).

The Third Circuit illustrated these principles in Farina v. Nokia, 625 F.3d at 122-129. There, the Court ruled that Federal Communications Commission ("FCC") regulations preempted state law claims that cell phones were "unsafe to operate without headsets because of their emission of RF radiation – despite the fact that their emission levels were in compliance with FCC standards." Id. at 122, 131. The Court explained that because defendant had already followed all FCC regulations, the state law claims acted to add additional guidelines which undermined the FCC's decision in prioritizing its objectives. Id. at 122-125; see also, Geier v. American Honda Motor Co., 529 U.S. 861, 875, 886 (2000) (finding that the Department of Transportation's ("DOT") regulation allowing manufacturers to decide between a number of "passive restraint devices" preempted state law claim that the car was defective because it did not have an air bag; the DOT had to consider safety, cost to vehicle owners, developments in technology, and consumer preferences, and allowing alternative standards via state law claims would upset the balance). The Court reasoned that allowing the state law claims to go forward would conflict with FCC regulations as "[a] jury determination that cell phones in compliance with the FCC's SAR guidelines were still unreasonably dangerous would, in essence, permit a jury to second guess the FCC's conclusion on how to balance its objectives." Farina, 625 F.3d at 125.[4]

---

[4] In Farina, the Court also pointed out the importance of uniformity in cell phone regulation: "uniformity in regulation helps ensure that adequate service is accessible throughout the country at a low cost." 625 F.3d at 124.

Other Courts have declined to find preemption where defendants did not comply with the HAMP and thus the state law claims did not interfere with a regulatory scheme. For example, in Wigod v. Wells Fargo Bank, N.A., the plaintiff brought Illinois state law contract, tort, and fraud claims against Wells Fargo for denying her a permanent loan modification despite successfully completing her TPP and meeting all other requirements. 673 F.3d 547, 557-559 (7th Cir. 2012). The Court found that conflict preemption did not apply because Wells Fargo did not follow the HAMP guidelines and thus the state law claims would not "impose on Wells Fargo any duties that go beyond its existing obligations under HAMP." Id. at 579. Thus, "it would be a complete defense that Wells Fargo did follow HAMP guidelines…" Id; see also, Olivares v. PNC Bank, No. CIV. 11-1626 ADM/JJK, 2011 WL 4860167, at *1, 4 (D. Minn. Oct. 13, 2011) (finding the HAMP did not preempt state law claims where the plaintiffs claimed the defendant violated the HAMP guidelines when it denied them a permanent HAMP loan modification even though they met all qualifications and made all payments under their TPP.).

Here, despite receiving a fully compliant HAMP Loan Modification, Plaintiff argues that Defendant engaged in an "unconscionable commercial practice" in violation of the NJCFA and also violated the covenant of good faith and fair dealing because the Loan Modification (1) significantly increased her principal from $361,355.70 to $515,535.67 and (2) made her monthly payments unaffordable. See generally Compl. and ¶¶ 13-14, 17. It is not entirely clear from the Complaint whether Plaintiff claims that Defendant should _not_ have given her the HAMP Loan Modification that _she_ requested or that Defendant should have deviated from the HAMP guidelines

---

Uniformity is also important in the HAMP as it helps the program reach struggling homeowners swiftly. Office of the Special Inspector General for the Troubled Asset Relief Program, Factors Affecting Implementation of the Home Affordable Modification Program, 18 (March 25, 2010) (finding that one reason the HAMP did not move as quickly as intended was because servicers did not have enough personnel and training the available staff took longer than expected.)

and given her more favorable terms than the regulations provided, such as forgiveness of the deferred principal balance. Under either scenario, her two state law claims are preempted.

As to the first scenario, Defendant had no choice but to offer her the loan if she otherwise qualified. The MHA Guidelines require participating institutions to offer inquiring borrowers a TPP if they meet all requirements including that the modified loan would be profitable under the NPV analysis. MHA Handbook at 118-119. [5] The institution is then required to make the loan modification permanent if the borrower successfully completes the TPP. Id. at 122. Indeed, banks that fail to offer HAMP loan modifications to qualified applicants can be subject to liability. See, e.g., Bukowski v. Wells Fargo Bank, N.A., 757 F. App'x 124 (3d Cir. 2018); Olivares, 2011 WL 4860167; Speleos v. BAC Home Loans Servicing, L.P., 755 F. Supp. 2d 304 (D. Mass. 2010); Wigod, 673 F.3d. Thus, the state law claims predicated on the theory that Defendant should not have offered the loan modification for which Plaintiff qualified directly conflict with the HAMP.

The second scenario – that Defendant should have offered more favorable terms than those established by the HAMP – would likewise conflict with the regulatory scheme. Plaintiff claims that the loan was unconscionable because it was "underwater," i.e., that the principal was significantly higher than the appraised value of the property due to the capitalization of Plaintiff's arrears that Defendant deferred to the end of the loan. Pl. Opp. at 2. Plaintiff also argues that more favorable terms should have been offered to prevent the high Loan-to-Value Ratio that was created by the modification, including forgiving the deferred principal balance. Id. But Defendant had little to no control over the loan's terms. The waterfall method mandated by the MHA Handbook required Defendant to capitalize arrears, reduce the interest rate to a floor of 2 percent, extend the

---

[5] In fact, if the NPV had revealed that it would be less profitable to modify the loan, Defendant would not have been required to offer the loan modification. MHA Handbook at 118-119.

11

term of the loan up to 40 years, and defer a portion of the principal to the end of the loan in that order until the Plaintiff's monthly payments were as close to 31 percent of her gross monthly income as possible. MHA Handbook at 108-112. This is precisely what Defendant did. Def. SOUMF ¶ 23-28. Plaintiff's principal grew because Defendant – applying the guidelines -- capitalized her arrears and then deferred them without interest to assist in lowering her monthly payments. Def. SOUMF ¶ 23. Defendant calculated her new monthly payments to be 31 percent of her gross monthly income, a fact that is not disputed by Plaintiff. Def. SOUMF ¶ 20; Pl. RSOCMF ¶20. Stated differently, to reach the lower monthly payments and make the loan affordable, Defendant was required by the guidelines to defer a portion of the principal until the end of the loan.

A contrary conclusion would upset the delicate balance of statutory objectives carefully expressed in the HAMP and set forth in the MHA Handbook. In the TARP, Congress asked the Secretary to consider, among other things, "protecting the interests of taxpayers," "providing stability and preventing disruption to financial markets," "the need to help families keep their homes and to stabilize communities," "ensuring that all financial institutions are eligible to participate in the program without discrimination," and "providing financial assistance to financial institutions." 12 U.S.C. § 5213. The strict criteria developed for HAMP loan modifications seek to achieve that balance. As in Farina, if state laws are allowed to add or alter rules on top of what a federal agency has already regulated, it would permit states to rebalance the agency's careful considerations. 625 F. 3d at 122. That is not permitted. Thus, the state law claims asserted here and premised on the theory that Defendant should have deviated from the HAMP guidelines and offered more favorable terms would directly conflict with the HAMP regulatory scheme and are preempted.

## IV. CONCLUSION

For the reasons set forth herein, Defendant's Motion for Summary Judgment, ECF No. 75, is **GRANTED**.  An appropriate Order follows.

Dated: October 20, 2022

*s/ Madeline Cox Arleo*
**Hon. Madeline Cox Arleo**
**UNITED STATES DISTRICT JUDGE**
