<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| JUDITH INSELBERG VAN ETTEN,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO BANK, NA,<br><br>Defendant. | Case No. 2:18-cv-11638 (BRM) (JSA)<br><br>**OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is Defendant Wells Fargo Bank's ("Wells Fargo") Second Renewed Motion for Summary Judgment. (ECF No. 115) ("Motion"). Plaintiff Judith Inselberg Van Etten ("Plaintiff") filed an Opposition on April 3, 2025. (ECF No. 116.) ("Opposition"). Wells Fargo filed a Reply on April 17, 2025. (ECF No. 118.) Having reviewed and considered the submissions filed in connection with the Motion and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause having been shown, Wells Fargo's Motion for Summary Judgment is **GRANTED**.

## I.    BACKGROUND

This dispute centers around Plaintiff's request for and acceptance of a loan modification (the "Modification") under the federal Home Affordable Mortgage Program ("HAMP"). Plaintiff claims that the terms of the Modification were unsuitable and predatory, and that, by offering and permitting Plaintiff to accept such terms, Wells Fargo has engaged in unconscionable commercial practices in violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1 *et seq.* ("NJCFA"), and breached the covenant of good faith and fair dealing. (ECF No. 116 at 4–9, 12.)

### A.    Plaintiff Purchases the Property

In November 2005, Plaintiff, a licensed realtor (Plaintiff Dep. (ECF No. 116-3) at 45:5–48:15),[1] purchased a condominium located in West New York, New Jersey (the "Property") (Def's SUMF (ECF No. 115-2) at ¶ 1). To finance the purchase, Plaintiff obtained a mortgage loan for $359,000 from Wells Fargo.[2] (*Id.*)

### B.    Plaintiff Defaults on Her Mortgage Payments and Seeks Various Forms of Relief

Within two years, Plaintiff defaulted on her loan obligations. (ECF No. 115-2 ¶¶ 1, 3; Pl's Opp'n to Def's SUMF (ECF No. 116-1) at ¶ 3.) Over the next several years, Plaintiff took various steps to retain the Property.

Some of these efforts involved agreements with Wells Fargo.[3] For example, Plaintiff signed two Special Forbearance Plans with the Bank, one in March 2008 and the other in August 2009, after defaulting on her mortgage payments. (ECF Nos. 115-11, 115-14.) Plaintiff failed to make payments per the Plans' terms, and was removed from forbearance both times. (ECF No. 116-1 ¶¶ 4, 8).

Plaintiff also applied for a series of loan modifications. Plaintiff was approved for and signed what appears to be her first modification in summer 2008 (*see* ECF No. 115-13), and, as

---

[1] Plaintiff was at one time licensed in both New Jersey and New York, but is currently licensed only in New Jersey. (ECF No. 116-3 at 48:16–49:7.)

[2] The term of the loan was for thirty years, and the initial adjustable interest rate was 5.875 percent, with a maximum rate of 11.875 percent. (ECF No. 115-2 ¶ 2.) Plaintiff's monthly principal and interest payment (excluding escrow for taxes and insurance) was $2,123.72. (*Id.*)

[3] Plaintiff also appears to have written various hardship letters to Wells Fargo. (ECF Nos. 115-19, 115-26.)

part of the modification, thousands of dollars in arrearages were capitalized into Plaintiff's new loan balance[4] (ECF No. 115-2 ¶ 6).

Plaintiff's other applications for loan modifications, however, were less successful. Plaintiff applied for a modification under the HAMP program in 2010, but her application was denied (ECF No. 115-20), purportedly due to Plaintiff's failure to submit appropriate documentation on time (ECF Nos. 115-18, 115-20).[5] Another application for a loan modification was denied in 2012, again, for Plaintiff's alleged failure to provide documentation.[6] (ECF Nos. 115-24–25.)

In addition to seeking assistance from Wells Fargo, Plaintiff turned to the bankruptcy court, filing a counseled petition for Chapter 7 bankruptcy in March 2012. (ECF Nos. 115-2 ¶ 13, 115-21.) Plaintiff was discharged from bankruptcy approximately three months later. (ECF Nos. 115-2 ¶ 16, 115-23.)

## C.    Wells Fargo Contemporaneously Initiates Foreclosure Proceedings

Starting in March 2009, Wells Fargo began to send Plaintiff Notices of Intent to Foreclose (ECF No. 115-15), and in May 2009, Wells Fargo filed the foreclosure action (ECF No. 115-16).

---

[4] Specifically, $14,899 in arrearages were capitalized into the new loan balance of $364,191.25, and Plaintiff's monthly payment increased to $2,232.99. (ECF No. 115-2 ¶ 6.)

[5] One letter, dated August 17, 2010, stated that "after carefully reviewing the information you've provided, . . . [w]e are unable to adjust the terms of our mortgage through [HAMP] because you did not provide us with valid documents as requested." (ECF No. 115-20 at 2.) Another letter, dated January 11, 2011, stated, "We are unable to offer you a Home Affordable Modification because you did not provide us with the documents we requested. A notice which listed the specific documents we needed and the time frame required to provide them was sent to you more than 30 days ago." (*Id.* at 4.)

[6] Plaintiff disputes Wells Fargo's characterization and again blames the denial on Wells Fargo employees. (*See* ECF No. 116-1 ¶ 16.)

It is undisputed that Plaintiff "never appeared in the foreclosure action or contested the foreclosure in any way." (ECF Nos. 115-2 ¶ 11, 115-17.)

Final judgment was entered against Plaintiff in February 2013 in the amount of $471,070.03, "together with 5.875 [percent] interest accruing on the $395,622.95 amount of principal and advances in default." (ECF No. 115-2 ¶ 17.) A sheriff sale was scheduled for October 2013. (*Id.* at ¶ 18, ECF No. 115-28.)

### D.    Plaintiff Keeps Her Home with a HAMP Modification

Just months before the Property was scheduled to be sold, however, Plaintiff was given yet another opportunity to save her Property: she applied for and was approved for a HAMP Trial Payment Plan ("TPP").[7] (*See* ECF No. 115-29.)

### 1.    <u>HAMP</u>

In response to deteriorating market conditions in 2008, Congress enacted the Emergency Economic Stabilization Act (the "EESA"). 12 U.S.C. § 5201 *et seq.* The "centerpiece" of the EESA was the Troubled Asset Relief Program (the "TARP"), 12 U.S.C. §§ 5211–5241, which required the Secretary of the Treasury, "among many other duties and powers," to "implement a plan that seeks to maximize assistance for homeowners and . . . encourage the servicers of the underlying mortgages . . . to take advantage of . . . available programs to minimize foreclosures." *Wigod v. Wells Fargo Bank*, 673 F.3d 547, 556 (7th Cir. 2012) (quoting 12 U.S.C. § 5219(a)).

---

[7] The parties dispute whether the Property was Plaintiff's primary residence—a prerequisite for HAMP eligibility—at the time she applied for the HAMP Modification. (*Compare* ECF No. 115-1 at 4, 25–27 ("Plaintiff's claims are barred by the doctrine of unclean hands [because] . . . documentary evidence reveals that when she applied for her modification, Plaintiff misrepresented to Wells Fargo that the Property was her principal dwelling, but it was not."), *with* ECF No. 116 at 12–13 (explaining that Plaintiff lived at the Property until approximately 2014, after which her brother "suggested that he would move there," and that this dispute is "[a]t most . . . a credibility issue")).

Pursuant to this authority, in 2009, the Secretary developed the Making Home Affordable Program, which included HAMP in its suite of programs for struggling homeowners. Department of the Treasury, *Making Home Affordable Handbook*, 69-163 (Version 4.3 Sep. 16, 2013) (the "MHA Handbook").[8]

"HAMP's goal is to offer homeowners who are at risk of foreclosure reduced monthly mortgage payments that are affordable and sustainable over the long-term," specifically those homeowners who have shown "[d]ocumented financial hardship" and "[a]n ability to make their monthly mortgage payments after a modification." *Home Affordable Modification Program (HAMP)*, U.S. Dep't of the Treasury, https://home.treasury.gov/data/troubled-assets-relief-program/housing/mha/hamp (last visited October 28, 2025). A loan servicer's participation is voluntary. *Id.* But if it decides to enter the program, it is bound to follow HAMP's guidelines. MHA Handbook at 14.

Participating servicers follow a three-step process to evaluate a homeowner's eligibility for a modification. To start, the homeowner must meet certain threshold requirements, including that: (1) the loan must have originated on or before January 1, 2009 and have been secured by the borrower's principal residence; (2) the mortgage payments are more than 31 percent of the borrower's monthly income; and (3) for a one-unit home, the unpaid principle is no greater than $729,750. *Id.* at 70–71.

Second, the servicer calculates the modification using the "waterfall" method, *see infra*, applying enumerated changes to the mortgage in a particular sequence until the homeowner's monthly payment ratio drops as close as possible to 31 percent. *Id.* at 108–12.

---

[8] Version 4.3 of the MHA Handbook was in effect when Plaintiff received her modification. It "incorporates and supersedes in their entirety" various earlier Supplemental Directives, FAQs, and waivers, including, relevant here, Supplemental Directive 09-01. *Id.* at 14.

Third, the servicer conducts a Net Present Value ("NPV") analysis "to assess whether the modified mortgage's value to the servicer would be greater than the return on the mortgage if unmodified." *Wigod*, 673 F.3d at 557. In other words, the NPV determines whether it would be more profitable for the servicer to allow the loan to go into foreclosure. *Id.* (citation omitted). If the modified mortgage's value is lower than the servicer's expected return post-foreclosure, the servicer is not required to offer a modification. But if the modification is more profitable than the original loan, the servicer *must* offer it. *Id.* (quoting Supplemental Directive 09-01); *see also* MHA Handbook at 118–19.

### 2. **The Trial Period Plan**

If a homeowner qualifies for a modification under HAMP, they first participate in a Trial Period Plan ("TPP"), during which the homeowner demonstrates they can make the payments on the modified loan for three months. *Id.* at 122–26. If the homeowner successfully pays each month during the TPP, among other requirements, the servicer is required to offer the permanent modification. *Id.* at 122.

### 3. **Plaintiff's Loan Modification**

Plaintiff applied for a HAMP modification and was approved for a TPP in August 2013. (ECF No. 115-2 ¶ 19). It is undisputed that Wells Fargo complied with the aforementioned requirements in implementing Plaintiff's HAMP modification. (*Compare* ECF No. 115-2 ¶¶ 23–26, 29–32, *with* ECF No. 116-1 ¶¶ 23–26, 29–32.)

### a. Wells Fargo's Application of the Waterfall Method

Wells Fargo first verified that Plaintiff met the threshold requirements for a modification. (ECF No. 115-29 at 2.) Second, it calculated her gross monthly income to be $6,645.[9] (*Id.*; *see also* ECF No 115-2 ¶ 20.) Wells Fargo then applied the following waterfall steps in sequence until Plaintiff's monthly payments were approximately 31 percent of her monthly income. (ECF No. 115-2 ¶¶ 23–26.)

"Wells Fargo first capitalized accrued interest, out-of-pocket escrow advances, and servicing advances." (*Id.* ¶ 23); MHA Handbook at 109. Next, it reduced Plaintiff's interest rate to 2 percent—the lowest available rate under HAMP—for the first five years of the Modification. (ECF No. 115-2 ¶¶ 24, 28.) The interest rate would increase gradually over time, but never to an amount higher than Plaintiff's original rate.[10] (*Id.* ¶¶ 2, 28.)

Wells Fargo then extended the term of Plaintiff's loan to forty years—the longest permissible extension—and reamortized it. (*Id.* ¶¶ 25, 28); MHA Handbook at 110. Finally, consistent with the final step of the waterfall method, Wells Fargo "deferred, or 'set aside,' repayment of a portion of the outstanding balance until the loan was paid off and also waived interest on the deferred amount." (*Id.* ¶ 26.)

Having determined that Plaintiff qualified for a HAMP modification, Wells Fargo offered her a TPP, which she successfully completed.[11] (*Id.* ¶ 19.) On December 16, 2013, Plaintiff signed

---

[9] The Court notes that Plaintiff's TPP was formulated using a lower monthly income than Plaintiff reported in her July 29, 2013 request for borrower assistance form. (*See* ECF No. 115-27 at 2.) While Wells Fargo calculated her monthly income as $6,645.00, her self-reported gross income was $8,707.00 (*Compare* ECF Nos. 115-27 at 2 *with* 115-29 at 7) (*See also* ECF 115-2 ¶¶ 20–21).

[10] The interest rate was set at 2 percent for the first five years, 3 percent for the sixth year, 4 percent for the seventh year, and 4.250 percent for the remainder of the loan. (ECF No. 115-2 ¶ 28.)

[11] The TPP required Plaintiff to make three payments of $1,773.25 during the months of October,

an agreement memorializing her acceptance of a permanent HAMP Modification. (ECF Nos. 115-2 ¶¶ 22, 27, 33; 115-29.) Plaintiff's final judgement of foreclosure was vacated and she was able to keep the Property. (ECF No. 115-2 ¶ 33.)

### b.  The Terms of Plaintiff's Permanent Modification

Per the terms of the Modification, Plaintiff would begin by paying $1,773.39 per month, an amount that would increase gradually over time. (*See* ECF No. 115-29 at 4–5.) The modified loan's principal increased to $515,535.67 due to the capitalization of Plaintiff's arrears, but $241,200 of that amount was deferred, interest free, to the end of the loan's term to help lower Plaintiff's payments as per HAMP regulations. (*Id.* at 4; ECF No. 115-2 ¶ 28.) Per the explicit terms of the Modification, Plaintiff agreed:

> to pay in full the Deferred Principal Balance less any Deferred Principal Reduction Amount to which [she was] entitled, and any other amounts still owed under the Loan Documents by earliest of: (i) the date I sell or transfer an interest in the Property; (ii) the date I pay the entire Interest Bearing Principal Balance; or (iii) the Maturity Date.

(ECF No. 115-30 at 4.)

Again, Plaintiff does not dispute that the Modification complied with the aforementioned HAMP guidelines and that Wells Fargo utilized model Freddie Mac instruments in formulating her loan. (*Compare* ECF No. 115-2 ¶¶ 23–26, 29–32, *with* ECF No. 116-1 ¶¶ 23–26, 29–32.)

### 4.  <u>Plaintiff Asks Wells Fargo to Forgive the Deferred Principal Balance</u>

A year and a half after signing the Modification, Plaintiff sent a letter to Wells Fargo claiming that she "did not quite understand the deferral issue and was under the impression that

---

November, and December 2013. (ECF No. 115-29 at 5.) The TPP also required Plaintiff to take part in free housing counseling to help her "create a household budget and develop an action plan to reduce [her] household debts" (*id.* at 2), and indicated that Wells Fargo "ha[d] other options" to help Plaintiff avoid foreclosure if she could not afford her trial payments (*id.* at 3).

the amount would never have to be repaid." (ECF No. 115-36.) She requested that the deferred amount—nearly $250,000—simply be forgiven. (*Id.*)

Wells Fargo declined, and confirmed with Plaintiff that the Modification she signed required her to "pay (in full) the Deferred Principal Balance, and any other amounts still owed on the loan documents." (ECF No. 115-37.) In 2017, Plaintiff's loan was transferred to another servicing company, Specialized Loan Servicing LLC. (ECF No. 115-58.)

In February 2018, Wells Fargo responded to an inquiry from Plaintiff's counsel concerning, among other things, "[f]orgiveness of the deferred principal balance." (ECF No. 115-59 at 1.) Wells Fargo informed counsel that he should contact Specialized Loan Servicer concerning forgiveness, but confirmed that "[t]he modification documents . . . advised the customer of the deferred principal balance and when it would have come due. By the customer signing the documents, it was understood the customer read and agreed to the terms of the modification." (*Id.* at 2–3.)

## II.    PROCEDURAL HISTORY

Approximately five months after her counsel's exchange with Wells Fargo, Plaintiff filed suit. (Compl. (ECF No. 1).)

### A.  The Complaint

While the Complaint lacks clarity concerning Plaintiff's theories of relief and which facts support them, Plaintiff asserts two counts against Wells Fargo: (1) violation of the NJCFA (*id.* ¶¶ 37–54), and (2) breach of the covenant of good faith and fair dealing (*id.* ¶¶ 55–62).

Plaintiff's general theory appears to be that the Modification—which Plaintiff, a seasoned realtor, solicited and accepted—was inherently predatory because it "place[d] the Property permanently underwater through a [Modification] which increased Plaintiff's Principal by a whopping 42 [percent]" (*id.* at 3), rendering her mortgage payments "neither affordable nor

sustainable over a long period of time" (*id.* ¶ 13). Plaintiff further contends she "has been deprived of all equity in the Property" because the modified principal balance "was so significantly higher than the appraised value of the Property" (*id.* ¶ 19), and alleges the deferred principal balance constitutes "a draconian balloon payment obligation that placed the already underwater mortgage even further underwater" (*id.* ¶ 20).

Peppered throughout Plaintiff's Complaint are other statements and allegations that do not appear to challenge the explicit terms of the Modification, but rather Wells Fargo's conduct leading up to Plaintiff's acceptance. For example, Plaintiff notes in passing that "Wells Fargo could not provide her with the correct numbers or paperwork [concerning a loan modification] for two full years," causing Plaintiff to "[fall] behind on her mortgage payments." (*Id.* at 2, ¶ 9.) She further alleges "Wells Fargo omitted to advise Plaintiff as to what amount of [her monthly escrow payment] was for property taxes," insurance premiums, and "other required fees," and did not advise what constituted the "other required fees." (*Id.* ¶ 16.) In addition, Plaintiff alleges Wells Fargo "omitt[ed] to advise Plaintiff that they performed an appraisal" of her Property in connection to the Modification, "omitt[ed] to advise Plaintiff of the results of that appraisal," "omitt[ed] to advise Plaintiff that the appraisal had no bearing on the [Modification]," and "omitt[ed] to advise Plaintiff that the appraised value of the Property was considerably less than the New Principal Balance." (*Id.* ¶ 18.)

### B.  The Court Grants Wells Fargo Summary Judgment

Plaintiff survived Wells Fargo's motion to dismiss (ECF No. 12), but not its subsequent motion for summary judgment. This Court granted summary judgment to Wells Fargo, reasoning that Plaintiff's state law claims "premised on the theory that [Wells Fargo] should have deviated from the HAMP guidelines and offered more favorable terms would directly conflict with the

HAMP regulatory scheme and are preempted." *Van Etten v. Wells Fargo*, N.A., No. 18-11638, 2022 WL 11703733, at *7 (D.N.J. Oct. 20, 2022) ("*Van Etten I*").

### C. The Third Circuit Reverses and Remands

On appeal, the Third Circuit, recognizing that Plaintiff's "theories of liability are somewhat unclear in her Complaint," nonetheless reasoned that not all of Plaintiff's claims were, in fact, preempted. *Van Etten v. Wells Fargo Bank, NA*, No. 22-3179, 2024 WL 808972 (3d Cir. Feb. 27, 2024) ("*Van Etten II*"). Rather, "unlike a claim alleging unconscionability, certain state fraud and breach of contract claims are not preempted by HAMP." *Id.* at *1. So, "[t]o the extent that [Plaintiff's] state law claims are premised on causes of action relating to Wells Fargo's (i) failure to comply with its contractual commitments, or (ii) purported fraud, misrepresentations, or omissions in inducing her to enter into a HAMP modification, such state law claims are not preempted," as they merely supplement, not supplant, the federal scheme. *Id.* at *2–3.

The Third Circuit also recognized that Plaintiff raised novel theories of relief in her summary judgment briefing that made no appearance in her Complaint. *Id.* at *3 n. 21. Specifically, while Plaintiff only alleged in her Complaint that she *asked* Wells Fargo to forgive her deferred loan balance (ECF No. 1 ¶¶ 28–30), she argued in opposition to summary judgment that Wells Fargo "reneged on a *promise* to forgive part of her loan." *Van Etten II*, at *3 n.21 (emphasis added). Accordingly, the Third Circuit directed this Court to consider whether Plaintiff either constructively amended her complaint, or whether this Court should permit amendment regardless.

### D. Subsequent Proceedings Before This Court

Following the Third Circuit's directive, this Court held a hearing with counsel to clarify Plaintiff's theories of liability.

As to any claim that Wells Fargo reneged on a promise to forgive the deferred loan balance, or otherwise fraudulently induced Plaintiff to accept the Modification with that representation, counsel confirmed he was "abandon[ing]" that theory, and that "based upon credibility and the law and what [the Court] discussed today," he was "going to stick with the suitability, unconscionability theory . . . , [and] the underwater mortgage." (Hearing Tr. (ECF No. 12) at 21:4–18.) Counsel again confirmed his "whole theory" was that the Modification was a "[p]redatory underwater loan."[12] (*Id.* at 22:2–7.)

Following the hearing, Wells Fargo renewed its motion for summary judgment based on Plaintiff's counsel's representations at the hearing. (ECF No. 115.)

Despite Plaintiff's counsel's confirmation that his "whole theory" would be predicated on the terms of the mortgage itself, counsel continues to press the allegation that Wells Fargo promised to forgive the deferred loan balance.[13] Counsel cannot have it both ways. The Court will no longer

---

[12] This choice is unsurprising considering the lack of record evidence to substantiate any such claim. Plaintiff contends both her and her brother recalled phone conversations with a Wells Fargo representative, Cheryl Hawkins, who told Plaintiff that the deferred loan balance would be forgiven after a few months. (*See* ECF Nos. 103 at 6; 116-3 at 125:18–129:18; Eric Inselberg Dep. (ECF No. 116-5) at 16:15–23, 55:13–56:3, 58:7–11, 60:10–19.) But the call transcript with Ms. Hawkins included in the record demonstrates that, while Ms. Hawkins may have initially sown confusion concerning whether Plaintiff's loan would be forgiven, she took immediate steps to clarify the terms of Plaintiff's modification by connecting Plaintiff with her supervisor. (*See generally* ECF No. 115-38.) Hawkins's supervisor explained to Plaintiff that she would have to pay the deferred loan balance (*id.* at 14:18–16:5), an explanation that Plaintiff accepted without further questions concerning forgiveness.

[13] (*See, e.g.*, ECF No. 116 at 3 ("The only way this transaction would have been suitable and have made financial sense for Plaintiff would have been if the Deferred Principal Balance would have been forgiven, and indeed, [Wells Fargo] represented that it would be forgiven . . . ."); *id.* at 6 ("Plaintiff would have never entered into the [Modification] if it was not understood that the Deferred Principal Balance would be forgiven . . . ."); *id.* at 10 ("Wells Fargo's refusal to forgive the Deferred Principal Balance constitutes the non-occurrence of an event upon which the [Modification] was based, and renders the [Modification] financially impractical."); *see also* ECF No. 116-1 ¶¶ 37–39 ("Plaintiff would have never entered into the [Modification] if it was not understood that the Deferred Principal Balance would be forgiven . . . .").)

consider a theory that counsel has unequivocally abandoned on the record. *Cf. DeJames v. Magnificence Carriers, Inc.*, 654 F.2d 280, 284 n.1 (3d Cir. 1981).

As such, the Court addresses those arguments properly raised and concludes that summary judgment for Wells Fargo is warranted.

### III.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "On motions for summary judgment, the movant shall furnish a statement which sets forth material facts as to which there does not exist a genuine issue, in separately numbered paragraphs citing to the affidavits and other documents submitted in support of the motion." L. Civ. R. 56.1(a). A party asserting a genuine dispute of material fact must support the assertion by either "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). A factual dispute "is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and "is material only if it might affect the outcome of the suit under governing law." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment." *Read v. Profeta*, 397 F. Supp. 3d 597, 625 (D.N.J. 2019) (citations omitted). Irrelevant or unnecessary factual disputes will also not preclude a grant of summary judgment. *See Anderson*, 477 U.S. at 248. Moreover, "mere speculation does

not create genuine issues of material fact." *Dellapenna v. Tredyffrin/Easttown Sch. Dist.*, 449 F. App'x 209, 215–16 (3d Cir. 2011) (citing *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990)).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once a movant adequately supports its summary judgment motion, the burden shifts to the nonmovant to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (quoting *Anderson*, 477 U.S. at 255). In other words, in deciding a party's summary judgment motion, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 255. "Summary judgment is appropriate only when there are no genuine issues of material fact, drawing all justifiable inferences in favor of the nonmovant." *Adams v. Fayette Home Care & Hospice*, 452 F. App'x 137, 139 (3d Cir. 2011) (citing *Anderson*, 477 U.S. at 248, 255).

If the moving party bears the burden of proof at trial, summary judgment is not appropriate if the evidence is susceptible to different interpretations or inferences by the trier of fact. *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999); *see also id.* at 553 n.9 (noting "summary judgment is rarely

granted in a plaintiff's favor in cases where the issue is a defendant's racial motivation, such as disparate treatment suits under Title VII or racial discrimination claims under 42 U.S.C. § 1981"). On the other hand, if the non-moving party bears the burden of proof at trial, "summary judgment is warranted if the nonmovant fails to 'make a showing sufficient to establish the existence of an element essential to [its] case.'" *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (alteration in original) (quoting *Celotex Corp.*, 477 U.S. at 322). A "genuine issue as to any material fact" cannot exist if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322–23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. A material fact raises a "genuine" dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (quoting *Anderson*, 477 U.S. at 248).

## IV.    DECISION

Because Plaintiff's claims for violation of the NJCFA and breach of the covenant of good faith and fair dealing are predicated on the same facts and arguments (*see* ECF Nos. 1 ¶¶ 55–62; 116 at 12), the Court will structure its analysis by first addressing those of Plaintiff's theories of liability that remain preempted after *Van Etten II*, (*i.e.*, those arguments that challenge the HAMP-compliant terms of the Modification, and therefore "supplant" federal law). It will then address arguments that could be construed to target "Wells Fargo's (i) failure to comply with its contractual commitments, or (ii) purported fraud, misrepresentation, or omissions in inducing her to enter into a HAMP modification." *Van Etten II*, at *2.

### A. Plaintiff's Arguments Concerning the Terms of the Mortgage

As established during this Court's most recent hearing, the primary thrust of Plaintiff's case is that the Modification is predatory because it placed her mortgage "underwater." To support that theory, Plaintiff points to the following aspects of her Modification in her briefing: (1) the Modification increased her principal by 42.6 percent, and the amount of the principal due exceeded the value of the Property (ECF No. 116 at 6); (2) the Modification's loan-to-value ratio was 117.5 percent, which Plaintiff contends is "absurdly high" (*id.* at 8); (3) Plaintiff's monthly payments under the Modification were "greater than Plaintiff's reported monthly income[,] calling into question [Plaintiff's] ability to repay her loan obligation" (*id.*); and (4) the interest rate on the loan was 4.25 percent, which was allegedly too high (*id.*).[14]

While Plaintiff argues the Third Circuit has "forever remov[ed]" preemption as an issue from this case (ECF No. 116 at 19), Wells Fargo argues Plaintiff's arguments concerning the terms of the loan itself remain preempted after *Van Etten II*, (ECF No. 115-1 at 8). This Court agrees, because the above arguments "supplant" rather than "supplement" federal law. *Van Etten II*, at *3.

The Constitution's Supremacy Clause provides that "the Laws of the United States . . . shall be the supreme Law of the Land[.]" U.S. CONST., Art. VI, cl. 2. By consequence, federal law may preempt state law, either expressly or impliedly. *Van Etten II*, at *2. "Under the conflict preemption doctrine, federal law nullifies state law inasmuch as it conflicts with federal law, either where

---

[14] While Plaintiff discusses the "draconian balloon payment"—her deferred principal balance— "that placed [her] already underwater mortgage even further underwater" in her Complaint (*see* ECF No. 1 ¶ 20) and in her Counterstatement of Facts (*see* ECF No. 116-1 ¶ 73), Plaintiff omits any argument concerning that allegation from her summary judgment briefing. For the same reasons that Plaintiff's other arguments concerning the suitability of the loan's terms are preempted, *see infra*, any assertion that Wells Fargo acted unlawfully by deferring a portion of Plaintiff's payment—interest free—to the end of the loan's term *in compliance with HAMP's guidelines* would be preempted.

compliance with both laws is impossible or where state law erects an obstacle to the accomplishment and execution of the full purposes and objective of Congress." *Id.* (quotation marks omitted). The federal law in question can be a statute or regulation, and all forms of state law may be preempted, "including civil actions based on state law." *Id.* "The critical question . . . is always whether Congress intended that federal regulation supersede state law." *Id.* (quotation marks omitted).

Here, holding Wells Fargo liable for violating state law when it undisputedly calculated the terms of Plaintiff's Modification in compliance with federal HAMP requirements would under some circumstances make "compliance with both [state law and HAMP guidelines] impossible," and otherwise erect an "obstacle to the accomplishment and execution of the full objective of Congress." *Van Etten II*, at *2 (quotation marks omitted).

Plaintiff first laments that the Modification increased her principal by 42.6 percent, and that the amount of principal due exceeded the value of her Property at the time of the Modification.[15] (ECF No. 116 at 6.) But, in line with HAMP's waterfall method, Wells Fargo was directed to capitalize arrears, including "accrued interest, out-of-pocket escrow advances, and servicing advances." (*See* ECF No. 115-2 ¶ 23); MHA Handbook at 109. Having made no payments on her mortgage for several years, Plaintiff's principal balance necessarily reflected a

---

[15] The Court observes, without making any findings, that Plaintiff's property has likely increased significantly in value since she signed the Modification. (*See* Supp. Murphy Cert. Ex. 58 (ECF No. 118-4) (showing that housing prices in the relevant Metrostatistical Area have increased on average by 187.38 percent).) Indeed, Wells Fargo's counsel indicating during this Court's hearing that the Property was listed online as valued at $470,000 (ECF No. 12 at 12:16–18), a representation that Plaintiff's counsel did not dispute. It is not inconceivable that Plaintiff's Property will continue to increase in value during the duration of the loan's term, which extends until 2053. (*See* ECF No. 115-2 ¶ 28.)

significant increase that Plaintiff would have still owed to Wells Fargo without the Modification. (*See* ECF No. 116-1 ¶ 106; Bryar Report (ECF No. 115-4) at ¶ 49.)

Wells Fargo, following Freddie Mac templates, explicitly communicated this increase in the modification agreement. (*See* ECF Nos. 115-2 ¶ 31; 115-30 at 4 ("[T]he modified principal balance of [the] Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid interest, fees, escrow advances and other costs, but excluding unpaid late charges . . . ).) If Wells Fargo did not comply with HAMP guidelines or denied Plaintiff a modification on the basis of her increased principal, it may well have exposed itself to liability. *See, e.g.*, *Bukowski v. Wells Fargo Bank, N.A.*, 757 F. App'x 124, 129–30 (3d Cir. 2018) (finding that plaintiffs stated a claim under the NJCFA regarding "Wells Fargo's [mis]representations concerning [plaintiffs'] eligibility for a permanent HAMP modification," and a claim for breach of contract when "Wells Fargo issued [plaintiffs] a HAMP modification that allegedly contravened HAMP's guidelines"); *Olivares v. PNC Bank*, No. 11-1626, 2011 WL 4860167 at *1, 4 (D. Minn. Oct. 13, 2011) (concluding that HAMP did not preempt state law claims where plaintiffs claimed the defendant violated the HAMP guidelines when it denied them a permanent HAMP loan modification even though they met all qualifications and made all payments under their TPP); *Wigod*, 673 F.3d at 585–86.

Plaintiff next contends the loan was predatory because the LTV was 117.5 percent, which she states is "absurdly high" compared to LTV ratios for other types of home loans. (*See* ECF No. 116 at 7–8.) But, per HAMP guidelines, Wells Fargo was not permitted to consider LTV in assessing a borrower's eligibility for a loan modification. *See, e.g.*, MHA Handbook at 77 ("Servicers may not refuse to evaluate an otherwise eligible borrower based on the LTV ratio of the mortgage except to the extent it impacts the NPV evaluation . . . ."). Plaintiff likewise

complains that her loan was predatory because the interest rate, which was at all times lower than her original interest rate[16] (*see* ECF No. 115-2 ¶¶ 2, 28), was allegedly higher than rates of other types of mortgages at the time (*see* ECF Nos. 116 at 8; 116-1 ¶ 110). But HAMP guidelines delineated specific steps for adjusting interest rates, and Wells Fargo complied with those instructions. (*See* ECF No. 115-2 ¶¶ 24, 28, 32); MHA Handbook at 109–110. Again, for Wells Fargo, all roads lead to Rome: It could offer Plaintiff a modification with HAMP-compliant terms that Plaintiff deemed unsuitable under state law, deny a modification on an impermissible basis, or deviate from HAMP guidelines, but each choice could expose it to liability.

Finally, Plaintiff argues that her Modification was predatory because her monthly payments were purportedly greater than her monthly income. (ECF Nos. 116 at 8; 116-1 ¶¶ 59–61.) This claim is dubious[17] and otherwise preempted. Plaintiff does not contend Wells Fargo deviated from the applicable waterfall method when formulating her monthly payments or mistakenly approved her for the Modification. (*Compare* ECF No. 115-2 ¶¶ 23–26, *with* 116-1 ¶¶ 23–26.) The affordability ratio is reached by applying the "*enumerated* changes in a *specified* order" under the

---

[16] Plaintiff's original mortgage had an adjustable interest rate starting at 5.875 percent, increasing up to 11.875 percent, *see supra* note 2, while the Modification's interest rate was set at 2 percent for the first five years, 3 percent for the sixth year, 4 percent for the seventh year, and 4.250 percent for the remainder of the loan. (ECF No. 115-2 ¶ 28.)

[17] Plaintiff claims that her income was less than $1500.00, and her monthly payments under HAMP started at $1773.39, not including the cost of a purported "community fee," the existence of which is unsupported by any citation to the record. (*See* ECF No. 116-1 ¶¶ 60–62.) But Plaintiff does not dispute that she submitted a borrower assistance form just weeks before she was approved for a HAMP TPP that listed her monthly income as $8707 (*see* ECF No. 115-22; *compare* ECF No. 115-2 ¶ 21 *with* 116-1 ¶ 21), nor does she argue Wells Fargo miscalculated her monthly income for the TPP as $6645. Instead, Plaintiff supports her assertion by relying on a borrower form she submitted to Wells Fargo several years prior. (ECF Nos. 116-1 ¶ 60; 115-18 at 5.) As in its prior opinion granting summary judgment, this Court deems it undisputed that her income at the time of her approved HAMP application was significantly higher than Plaintiff represents. *Van Etten I*, at *2 n.3. This Court is not required to credit factual assertions that are contradicted by the exhibits. *See Scott v. Phila. Parking Auth.*, No. 23-3371, 2023 WL 6447252, at *3 (E.D. Pa. Oct. 2, 2023).

HAMP guidelines, *Wigod*, 673 F.3d at 556 (emphasis added); MHA Handbook at 108–09 ("[S]ervicers must apply the modification steps enumerated below in the stated order of succession until the borrower's monthly mortgage payment ratio is reduced to 31 percent."), and Plaintiff's payment was undisputedly within the permissible range[18] (ECF No. 115-2 ¶ 23). As such, it is not clear whether Plaintiff suggests that Wells Fargo should have denied her application for a modification or manipulated calculations to further lower her payments, but, again, both expose Wells Fargo to potential liability.

True, it appears that HAMP does "not preclude[]" servicers from "providing borrowers with a more favorable modification than that required by HAMP," so long as changes "accord[] with investor guidelines."[19] MHA Handbook at 112. But even accepting that Wells Fargo *could have* provided Plaintiff with a more favorable modification while complying with both state and federal law, to *require* servicers to exercise that discretion to satisfy ill-defined state duties would erect an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Van Etten II*, at *2 (quotation marks omitted), by "impos[ing] substantive duties that

---

[18] In fact, Plaintiff's initial monthly payments of $1,773.39 were approximately 27 percent of her gross income in August 2013. (*See* ECF No. 115-4 ¶ 47.)

[19] This provision applies to "HAMP Tier 1" modifications, which the record indicates Plaintiff received. (*See* ECF No. 115-31); MHA Handbook at 112. These changes include, for example, "a modification where the interest rate does not step up after five years or where the interest rate is reduced to less than 2.0 percent," "a modification where additional principal forbearance is substituted for extending the term as needed to achieve the target monthly mortgage payment ratio," and "a modification that reduces a borrower's monthly mortgage payment ratio below 31 percent." MHA Handbook at 112.

go beyond HAMP's requirements" and "expos[ing] mortgage servicers to multiple and varied standards of conduct," *Wigod*, 673 F.3d at 580.[20, 21]

Indeed, the MHA Handbook directs servicers to "implement the program in compliance with state common law and statutes,"[22] *id.*; *see* MHA Handbook at 32, a directive that, while not dispositive, requires this Court's consideration, *Wigod*, 673 F.3d at 580 ("[T]he agency's own tacit view of its program's lack of preemptive force is entitled to some weight." (citing *Wyeth v. Levine*, 555 U.S. 555, 577 (2009))). This provision makes sense to the extent the Treasury intended it to permit state law claims that "mirror its own directives." *Id.* And as *Wigod* made clear, "[t]here is no indication that Congress meant to foreclose suits against servicers for violating state laws that impose obligations *parallel* to those established in [HAMP]." *Id.* (emphasis added). But Plaintiff's suitability argument turns government objectives on their head. These objectives undoubtedly

---

[20] The Court acknowledges that, in addressing Wells Fargo's arguments concerning obstacles state tort suits may mount to the execution of Congressional objectives, the Seventh Circuit did not squarely address whether state law claims that impose duties *beyond* those delineated by HAMP would be preempted in *Wigod*. *See Wigod*, 673 F.3d at 579 ("[N]one of Wigod's claims, at least as she has framed them, would impose on Wells Fargo any duties that go beyond its existing obligations under HAMP.").

[21] The Court observes that the HAMP guidelines also appear to account for deviations from the waterfall method in cases where "a servicing agreement, investor guidelines or applicable law restricts or prohibits a modification step." MHA Handbook at 114–15. But Plaintiff has not pointed to any agreement or specific law that would have required Wells Fargo to alter or skip a particular step of the waterfall methodology.

[22] Plaintiff argues that a similar HAMP provision in now superseded Supplemental Directive 09-01 defeats Wells Fargo's preemption argument. (*See* ECF No. 116 at 6–7 (citing *Wigod*, 673 F.3d at 580)). Pointing to a New Jersey Supreme Court case, *Gonzalez v. Wilshire Credit Corporation*, 25 A.3d 1103 (N.J. 2011), Plaintiff contends the Modification was not fully HAMP "compliant" for Wells Fargo's apparent failure to abide by the decision. But *Gonzalez* held under distinguishable circumstances only that the NJCFA can apply to "post-foreclosure-judgment agreement[s] involving a stand-alone extension of credit." *Id.* at 1121. Plaintiff fails to persuasively articulate how *Gonzalez* renders her Modification otherwise non-compliant with HAMP, or, more broadly, why the Court should construe the provision to permit any and all state law claims.

include incentivizing servicers like Wells Fargo to participate in programs like HAMP, *id.*, and aiding struggling homeowners who demonstrate the ability to make the required payments.[23] Exposing a servicer to uncertain liability concerning the terms of a loan when it complied with carefully crafted federal guidelines in formulating it would erect obstacles to those goals. *Cf. Farina v. Nokia Inc.*, 625 F.3d 97, 122–27 (3d Cir. 2010); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 875, 886 (2000).

This case is distinguishable from *Gonzalez v. Wilshire Credit Corp.*, 25 A.3d 1103, 1118 (N.J. 2011), where the New Jersey Supreme Court held that a non-HAMP lending agreement may fall within the NJCFA's ambit. It is also distinguishable from other decisions within this District holding that the terms of non-HAMP loan agreements may themselves violate the NJCFA. *See, e.g.*, *Pezza v. Wells Fargo Bank, N.A.*, No. 09-2097, 2011 WL 3847248, at *10 (D.N.J. Aug. 30, 2011) (denying summary judgment to Wells Fargo on plaintiff's claim that Wells Fargo engaged in an unconscionable business practice by "providing Plaintiffs with a possibly unaffordable loan" that did not arise under HAMP). Under the current circumstances, where the modified loan was borne from a comprehensive federal scheme and Wells Fargo has indisputably followed federal guidelines when calculating the loan's terms, the Court concludes, in line with the Third Circuit's guidance, that Plaintiff's claims remain preempted.[24]

---

[23] In the TARP, Congress asked the Secretary to consider, among other things, "protecting the interests of taxpayers," "providing stability and preventing disruption to financial markets," "the need to help families keep their homes and to stabilize communities," "ensuring that all financial institutions are eligible to participate in the program, without discrimination," and "providing financial assistance to financial institutions." *See* 12 U.S.C. § 5213.

[24] For thoroughness, a handful of related arguments bear brief mention. First, Plaintiff alleges in her Complaint (*see* ECF No. 1 ¶¶ 21–23), and restates in her Counterstatement of Facts (*see* ECF No. 116-1 ¶¶ 77–79), that Wells Fargo violated distinct Freddie Mac guidelines concerning predatory lending. After three rounds of summary judgment briefing, Plaintiff still does not discuss these guidelines at all in her briefing, quote them, or even attach them for this Court's

**B. Plaintiff's Assertions Not Concerning the Terms of the Modification**

Having considered those aspects of Plaintiff's arguments that target the terms of the Modification itself, and concluding that they fall within the part of the Court's prior opinion that the Third Circuit left undisturbed, the Court will now turn to any arguments that could be construed to target "Wells Fargo's (i) failure to comply with its contractual commitments, or (ii) purported fraud, misrepresentation, or omissions in inducing her to enter into a HAMP modification." *Van Etten II*, at *2.[25]

While Plaintiff uses the terms "misrepresentations," "fraud, [and] deception" throughout her briefing (*see, e.g.*, ECF No. 116 at 5,) she fails to identify with any specificity such misrepresentations or omissions in her briefing. *See* Fed. R. Civ. P. 9. Nor does she point to any failure of Wells Fargo to comply with its contractual commitments.

Though it is not the Court's job to dig through the record and formulate arguments on behalf of counsel, *see United States v. Morton*, 993 F.3d 198, 204 n.10 (3d Cir. 2021) ("[J]udges

---

consideration. Without any development of this argument in her briefing, the Court declines to entertain an argument that HAMP-specific guidelines, which Plaintiff does not dispute Wells Fargo followed when formulating her Modification's terms (*compare* ECF No. 115-2 ¶¶ 22–32, *with* 116-1 ¶¶ 22–32), somehow conflict with other federal guidelines also intended to aid homeowners.

Next, Plaintiff's contractual defenses, including that the Modification was unconscionable and void because it violated the NJCFA (*see* ECF No. 116 at 10–11), are both preempted along with Plaintiff's claims that the terms of the Modification violated the NJCFA and breached the covenant of good faith and fair dealing. *See* Van Etten II, at *1 ("[U]nlike a claim alleging *unconscionability*, certain state [law] claims are not preempted by HAMP.").

[25] As noted above, the Court will not consider any arguments related to Wells Fargo's purported promise to forgive Plaintiff's deferred principal balance, as this argument was unequivocally abandoned at oral argument. These include Plaintiff's cursory discussion of contractual defenses like frustration of purpose (ECF No. 116 at 10 ("Th[e Modification's] purpose is substantially frustrated if the Deferred Principal Balance is not forgiven.")) and impracticality (*id.* ("Wells Fargo's refusal to forgive the Deferred Principal Balance constitutes the non-occurrence of an event upon which the [Modification was based, and renders [it] financially impractical.")).

are not like pigs, hunting for truffles buried in the record" (citation modified)), out of an abundance of caution the Court will address allegations left undeveloped in Plaintiff's briefing, Complaint, and Counterstatement of Facts.

First, Plaintiff makes a passing reference to Wells Fargo's dilatory efforts in setting her up for modification review in the "Preliminary Statement" portion of her Opposition briefing.[26] (*See* ECF No. 116 at 1 ("For a variety of reasons, including the fact that [Wells Fargo] could not provide her with the correct numbers or paperwork for two full years, Plaintiff fell behind on her mortgage payments.").) Plaintiff, however, omits any substantive discussion concerning this allegation and fails to tie it into her briefing concerning her NJCFA or breach of good faith and fair dealing claim. As such, the Court would deem any argument concerning this assertion forfeited for purposes of this decision. *See Geness v. Cox*, 902 F.3d 344, 355 (3d Cir. 2018) ("[I]t is well settled that a passing reference to an issue will not suffice to bring that issue before [the] court." (quotation marks omitted)). But even accepting as true Plaintiff's allegation that the delay—and any related losses—was the product of Wells Fargo's incompetence, Plaintiff has not argued that this constituted an "unconscionable commercial practice," that the delay implicated an agreement existing between the parties at that time, or that Wells Fargo's conduct was fraudulent or taken in bad faith. Without more, the Court could not find that this allegation supports either of Plaintiff's claims.

Next, Plaintiff alleges in her Complaint, and repeats in her Counterstatement of Facts,[27] "Wells Fargo represented that the terms of the [Modification] require that the Monthly Escrow be

---

[26] (*See also* ECF No. 116-1 ¶¶ 12, 16 (describing "having to deal with inconsistent people at Wells Fargo who could not get the paperwork correct for many years."); *id.* at ¶ 55 ("Wells Fargo could not [sic] provide her with the correct numbers or paperwork for two full years.").)

[27] (*See* ECF No. 116-1 ¶¶ 63–65.)

set aside for the payment of Plaintiff's property taxes, insurance premiums, and other required fees." (ECF No. 1 ¶ 16.) But apparently, "Wells Fargo omitted to advise Plaintiff as to what amount of [her monthly escrow payment] was for property taxes," "insurance premiums," and "other required fees," and omitted to explain to Plaintiff what constituted the "other required fees." (*Id.*) Seeing that this allegation is completely absent from Plaintiff's briefing, the Court can only assume that it is not intended to support either of her claims. *See Durkin v. Wabash Nat'l*, No. 10-2013, 2013 WL 1314744, at *6 (D.N.J. Mar. 28, 2013) ("[A]rguments as to the force of [the] facts [raised in a Rule 56.1 statement] belong[] in the brief."). Nonetheless, any conceivable argument fails.

To the extent Plaintiff relies on a theory of fraudulent omission under the NJCFA, such a theory requires a showing of intent, as well as a duty to disclose. *See LS-NJ Port Imperial LLC v. A.O. Smith Water Prods. Co.*, No. 22-1687, 2022 WL 17547269, at *5–6 (D.N.J. Dec. 8, 2022); *see also* N.J. Stat. Ann. 56:8-2, 56:8-4. Plaintiff has made no argument or evidentiary showing that Wells Fargo withheld this information to induce her acceptance of the Modification, or that Wells Fargo had a duty to inform her. The Modification itself noted that escrow payments "may be adjusted periodically in accordance with applicable law and therefore [her] total monthly payment may change accordingly." (ECF No. 115-30 at 5; *see also* 115-4 ¶ 42 (explaining that "[t]he amount of a borrower's escrow payment may change once every year, depending on the servicer's forecasting of the borrower's future real estate tax and hazard insurance payment obligations").) Therefore, it is not apparent Wells Fargo could have even known the precise escrow payments for each given year when Plaintiff signed the Modification.

To the extent these allegations are intended to support her claim for breach of the covenant of good faith and fair dealing, Plaintiff has not asserted that Wells Fargo's purported omissions "ha[d] the effect of destroying or injuring [her] right . . . to receive the fruits of the [Modification]."

*Fairlawn Indus. Props., LLC v. H.J. Heinz Co., L.P.*, No. 15-1904, 2015 WL 4640624, at *2 (D.N.J. Aug. 4, 2015) (quotation marks omitted).

Finally, Plaintiff alleges in her Complaint:

> In connection with the [Modification], Wells Fargo completed an appraisal of the Property. Wells Fargo engaged in an unconscionable commercial practice, that lacked good faith, honesty in fact and observance of fair dealing by omitting to advise Plaintiff that they performed an appraisal; by omitting to advise Plaintiff of the results of that appraisal; by omitting to advise Plaintiff that the appraisal had no bearing on the [Modification]; and by omitting to advise Plaintiff that the appraised value of the Property was considerably less than the New Principal Balance.

(ECF No. 1 ¶ 18.) Plaintiff repeats this allegation in her Counterstatement of Facts, newly emphasizing that Wells Fargo completed a "drive-by appraisal" of her Property, rather than a "formal appraisal." (ECF No. 116-1 ¶¶ 68–70.)

As Plaintiff has failed to discuss this at all in her briefing, it is unclear whether she takes issue with the informal nature of Wells Fargo's appraisal, or the fact that it was completed without her knowledge. Regardless, neither theory supports relief.

Again, to the extent Plaintiff relies on a theory of fraudulent omission under the NJCFA, Plaintiff has likewise failed to show Wells Fargo's intent to deceive, or a duty to inform Plaintiff that it had appraised the Property. *LS-NJ Port Imperial LLC*, 2022 WL 17547269, at *5–6.

Considering that Plaintiff acknowledges that the appraisal had "no bearing on the Modification]," it is difficult to see how Wells Fargo's omission has somehow resulted in "bad-faith performance of [the] agreement" or deprived Plaintiff of its benefits. *Fairlawn*, 2015 WL 4640624, at *2–3. Further, Plaintiff included the approximate value of her Property in her bankruptcy filings, further undermining any argument that she was harmed by Wells Fargo's lack

of disclosure. (*See* ECF No. 115-21.) In other words, Plaintiff likely had some idea of what the Property was worth at the time she accepted the Modification.

As such, the Court concludes any claim concerning "Wells Fargo's (i) failure to comply with its contractual commitments, or (ii) purported fraud, misrepresentations, or omissions in inducing her to enter into a HAMP modification," *Van Etten II*, at *2, cannot survive summary judgment.

## V.   CONCLUSION

For the reasons set forth above, Wells Fargo's Second Renewed Motion for Summary Judgment (ECF No. 115) is **GRANTED**. An appropriate order follows.

*/s/ Brian R. Martinotti*
**HON. BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**

Dated:  October 28, 2025